Maria Crimi Speth, #012574
David S. Gingras, #021097
**JABURG & WILK, P.C.**
3200 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 248-1000

Attorneys for Defendants Edward
Magedson and Xcentric Ventures, L.L.C.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| GLOBAL ROYALTIES, LTD., a Canadian corporation; BRANDON HALL, a Canadian citizen,<br><br>      Plaintiffs,<br><br>v.<br><br>XCENTRIC VENTURES, L.L.C. *et al.*,<br><br>      Defendants. | Case No.:  CV 07-956 PHX-FJM<br><br>**MOTION TO DISMISS (AMENDED PER ORDER DATED: AUGUST 3, 2007)**<br><br>(Assigned to Hon. Frederick J. Martone) |

Defendants EDWARD MAGEDSON ("Magedson") and XCENTRIC VENTURES, L.L.C. ("Xcentric") respectfully request that this Court dismiss the above-captioned action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because the Complaint fails to state a claim upon which relief can be granted.

**I.    INTRODUCTION**

As the Court is aware, when considering a motion under Rule 12(b)(6), all material allegations of the Complaint are taken as true. *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004). For that reason, the background facts are taken solely from the Amended Complaint.

**A.    BACKGROUND—PARTIES**

Xcentric Ventures is an Arizona-based LLC which operates a website called www.RipoffReport.com ("ROR" or "Rip-Off Report"). Ed Magedson is the founder/Editor of Rip-Off Report and is the manager of Xcentric.

1    In short, the Rip-Off Report is a website which allows consumers to publish complaints about companies who they feel have wronged them in some manner. In general, anyone older than 14 years of age is allowed to sign up for a free ROR account; the only requirement is a valid email address which is automatically confirmed before an account can be used.

Once registered, a user who wants to post a complaint may click on a button labeled "File a Report" which takes the user to a page with various blank fields for them to enter data such as the name, address, and phone number of the subject company, a title for their report, followed by the body of the report itself. Users also "categorize" their report by selecting various adjectives from a long list which contains benign terms such as "Home & Garden" or more pejorative phrases such as "Corrupt Companies".

Once the user is satisfied with their report, they click a button to submit the report for publication. Xcentric charges nothing to its users to post or view reports.

As a general rule, it is undisputed that neither Xcentric nor Magedson conducts any investigation into the truth or accuracy of reports before they are published on the Rip-Off Report website. Once a report is published, the title and contents are eventually indexed by search engines such as Google so that a person who performs a search on Google for "XYZ Company" may see a link to one or more complaints about XYZ Company on Rip-Off Report, if any such reports exist.

Companies who are the subjects of complaints on Rip-Off Report are allowed to post a "rebuttal" explaining their side of the story. As with reports, Xcentric charges nothing to companies who wish to post rebuttals. As of July 2007, the Rip-Off Report site contains more than 250,000 original reports. Including rebuttals, the site contains more than one million (1,000,000) unique entries.

Plaintiff GLOBAL ROYALTIES, LTD. ("Global") is a Canadian-based corporation and Plaintiff BRANDON HALL ("Hall") is its principal. According to the Complaint, non-party SPENCER SULLIVAN ("Mr. Sullivan") posted a series of three different messages about Global/Hall on the Rip-Off Report website. Based on these

statements, Global and Hall have commenced an action in the Ontario (Canada) Superior Court of Justice against Mr. Sullivan, Xcentric, and Magedson.

In that proceeding, on February 23, 2007 the Canadian Court issued an order which required Xcentric to remove the three reports posted by Mr. Sullivan. However, the February 23 order makes no finding that the content at issue is false or defamatory, and the order states that "the issue of damages be referred to trial", suggesting that the Canadian litigation remains ongoing. In the first part of their Complaint, Plaintiffs seek an order from this Court recognizing and enforcing the Canadian "judgment" (order).

In the alternative, Plaintiffs present a single cause of action for defamation based on the same statements at issue in the Canadian litigation.

As explained fully below, the Canadian order (which is not a judgment) is not entitled to recognition in this County for multiple reasons. In addition, Plaintiffs' defamation claim fails to state a claim upon which relief can be granted. As such, this action should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## II. ARGUMENTS RE: MERITS OF PLAINTIFFS' DEFAMATION CLAIM

Plaintiff's Complaint presents two alternative theories which are mutually exclusive: 1.) Plaintiffs are entitled to relief based solely on the enforcement of a Canadian order; or, *alternatively* 2.) assuming the Canadian order is *not* entitled to recognition here, the same facts underlying the Canadian litigation are the subject of an independent cause of action for defamation in this Court.

Even assuming all of the allegations in the Complaint are true, the Canadian order is not entitled to recognition or enforcement in this case. However, prior to discussing this issue, it must be noted that Plaintiffs' underlying claim for defamation independently fails on its face, both factually and legally.

### A. The "First Statement" Is Barred By The Statute of Limitations

Plaintiffs' Complaint describes three separate statements which form Plaintiffs' defamation claim. The first statement, set forth in ¶¶ 13, 14 of the Complaint, was allegedly published on March 27, 2006.

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

3

Even assuming this allegation is true, it fails to state a claim because it is barred by the 1-year limitations period of A.R.S. § 12-541. *See Glaze v. Marcus*, 151 Ariz. 538, 729 P.2d 342 (App. 1986) (1-year limit on actions for libel/slander). This 1-year period begins to run on the date of publication, not the date the plaintiff discovers the publication. *See Lim v. Superior Court*, 126 Ariz. 481, 482, 616 P.2d 941, 942 (App. 1980).

Here, the Complaint alleges the "First Statement" was published on March 27, 2006. This action was commenced more than one year later on May 10, 2007. To the extent Plaintiffs' cause of action for defamation is based on the publication of this statement, the claim is barred by the statute of limitations and thus the claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### B.   The "Second Statement" Is Not Actionable

¶ 15 of the Complaint concerns a "Second Statement" published on June 8, 2006. Although this statement is not barred by the statute of limitations, it is nevertheless subject to dismissal because the statement is simply not defamatory as to Plaintiffs and is thus non-actionable as a matter of law. Specifically, ¶ 15 describes the "Second Statement" as containing two discrete sub-parts:

1.) "On or about June 8, 2006, Sullivan posted a second statement ("Second Statement") on the Ripoffreport.com Website in which he claimed that individuals associated with Plaintiffs were dishonorable and had engaged in criminal acts." (emphasis added) and

2.) "Sullivan also complained that Plaintiffs (through counsel) had 'threatened' him with legal action and that, in response to that threat, 'I am stating that I have no information that would indicate that Global Royalties is following anything but the best of business practices.'" (emphasis added)

Assuming these are the actual two statements as-published, they fail to state viable claims for defamation because the statements are not defamatory as a matter of law.

### 1.   Statements Concerning Third Parties Are Not Actionable

A defamation claim is a unique creature in that its purpose is to protect only one thing—the personal reputation of the individual defamed. Because of this, defamation includes a mandatory element that the offending statements must be *about* ("of and

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

4

concerning") the plaintiff, not a third party. *See, e.g., Hansen v. Stoll*, 130 Ariz. 454, 458, 636 P.2d 1236, 1240 (App.1981) (burden on plaintiff to show publication "of and concerning" him) (citing *inter alia* Restatement 2nd Torts §§ 564, 617).

Due to the highly personal interests involved, defamation claims are narrowly construed and are viewed as "non-relational" meaning: "The common law has always treated a cause of action for defamation as personal to the person defamed. [Citation] Consequently, no one—even a family member—has a separate defamation action *for defamation of another*." David A. Elder, *Defamation: A Lawyer's Guide* § 1:1[A][2] at 4 (emphasis added) (citing extensive authority). This rule applies to both individuals and corporations:

> Under the general rule, however, mere statements defamatory of [a corporation's] officers or agents do not defame the corporation. For example, it has been held not libelous of a *newspaper* to depict its *editor* as degenerate and immoral, not defamatory of a *corporation* to state that an *officer-shareholder* was a "bad man and dangerous character" suspected of arson, not defamatory of an *employment agency* to portray its *employees* as "fakirs, robbers, thieves, and business pirates … devoted to fraudulent practices," and not defamatory of a *company* to state that its *president* was "an evil man … fired from his job."

Edler, *supra* at 10–11 (emphasis added) (citing extensive authority). Given these standards, Plaintiffs cannot assert a defamation claim based on a statement which attacks the reputations of *third parties*: "individuals associated with Plaintiffs were dishonorable and had engaged in criminal acts." The allegation that some unknown third parties have engaged in wrongdoing could certain be defamatory as to those individuals, but they are not actionable by Plaintiffs because the statements are not specifically "of and concerning" Global Royalties or its principal, Brad Hall; it is not enough to simply say that Plaintiffs are "associated" with dishonorable individuals.

A thoughtful explanation of this rule is found in the First Circuit's opinion in *Emerito Estrada Rivera-Isuzu De P.R. v. Consumers Union of United States*, 233 F.3d 24 (1st Cir. 2000). In *Emerito*, the defendant (the publisher of "Consumer Reports" magazine) wrote a highly critical review of the Isuzu Trooper SUV.

5

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

Based on this review, the plaintiff (the sole Isuzu dealer in Puerto Rico) sued Consumer Reports for various claims including defamation. *See Emerito*, 233 F.3d at 25–26. The district court granted summary judgment in favor of defendants, finding that plaintiff's defamation claim failed because "none of the alleged falsehoods were 'of or concerning' the plaintiff Emerito." *Id*. at 26.

In a well-reasoned opinion, the First Circuit affirmed, explaining:

> Traditionally, the "of and concerning" requirement has been shorthand for a common law rule that a plaintiff in a defamation case must show that the statement referred to the plaintiff, either explicitly or by implication. [citation] <u>Conceivably defamation of one person could cause harm to another person who was not defamed</u>; for example, a wife might suffer emotional distress because her husband was libeled. <u>But at common law only the defamed person could sue</u>.

*Id*. (emphasis added) (citing *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980); *Prosser and Keeton on Torts* § 111, at 779-80, 783-85 (5th ed. 1984)).

Applying this standard here, it is apparent that the statement, "<u>individuals *associated with* Plaintiffs were dishonorable and had engaged in criminal acts</u>" would be defamatory of the individuals to whom this statement is directed, but it does not create a claim in favor of Plaintiffs simply because it suggests that they are "associated" in some vague manner with these individuals; "The general rule <u>does not allow plaintiff to sue</u> merely because he or she is linked merely by parentage, other blood relationship, <u>or friendship</u> to a person involved in or charged with crime." Elder, *supra* § 1:3[A] at 30 (citing, *inter alia*, *Jones v. Taibbi*, 400 Mass. 786, 512 N.E.2d 260, 265 (1987)).

**2. The Remaining Statements Are True And Are Not Defamatory**

The second part of the "Second Statement" cited in ¶ 15 of the Complaint is as follows: "'Sullivan also complained that <u>Plaintiffs (through counsel) had 'threatened' him with legal action</u> and that, in response to that threat, '<u>I am stating that I have no information that would indicate that Global Royalties is following anything but the best of business practices</u>.'" (emphasis added)

6

The "Third Statement" is found in ¶ 16 of the Complaint, also contains two parts. The first alleges that "<u>Sullivan stated that Plaintiffs (through counsel) had threatened him again and asked him not to mention Plaintiffs on the RipoffReport.com Website</u>. Sullivan advised anyone doing business with Plaintiffs to first contact the [Royal Canadian Mounted Police] and stated that 'I would think that any upstanding commercial operation could bear the scrutiny of a crime unit without any issue.'" (emphasis added).

These statements involve two different topics. First, that Plaintiffs' lawyers threatened Mr. Sullivan with legal action. Second, that anyone doing business with Plaintiffs should contact the Canadian police to check its references.

As to the first topic—alleged threats by Plaintiffs' lawyers—this statement is both non-defamatory as a matter of law, and, in any case, the allegation is substantially true. It is undisputed that Plaintiffs actually *did* take legal action against Mr. Sullivan in the Canadian action which produced the order they now seek to enforce in Arizona. Therefore, any statement suggesting that Plaintiffs' lawyers "threatened" Mr. Sullivan is non-actionable on the basis that it is either entirely or substantially true. *See Currier v. Western Newspapers, Inc.*, 175 Ariz. 290, 293, 855 P.2d 1351 (1993) (recognizing that a statement is "substantially true" and therefore not actionable when it "differs from the truth only in insignificant details.")

There is no meaningful difference between an accusation that Plaintiffs' lawyers "threatened to take legal action" and the true fact that Plaintiffs' lawyers *actually did take legal action* against Mr. Sullivan. Moreover, even if the alleged threat was untrue, a statement that someone was "threatened with legal action" by the plaintiff's attorney is simply not capable of a defamatory meaning. *See Godbehere v. Phoenix Newspapers, Inc*, 162 Ariz. 335, 341, 783 P.2d 781 (1989) ("To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation.")

In today's society, being threatened by an attorney, or asking an attorney to threaten another, does not impugn the character of those involved. Rather, it is such a

7

common, routine, and benign occurrence that it hardly justifies raising an eyebrow, particularly in a commercial context such as this (where Mr. Sullivan criticized a corporation and then remarked that the corporation's lawyers had threatened him). These are simply not the kinds of statements tort law is concerned with remediating.

For each of these reasons, Plaintiffs' defamation claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a viable claim.

**C.  Defendants Are Entitled to Immunity Under The Communications Decency Act**

Entirely separate and apart from the arguments stated above, Plaintiffs' defamation claim is subject to dismissal pursuant to Rule 12(b)(6) because Defendants are entitled to immunity pursuant to the Communications Decency Act, 47 U.S.C. § 230 (the "CDA"). It is well-established law that under certain circumstances, those who "publish" or "distribute" defamatory statements via traditional methods (i.e., a newspaper or magazine) can be liable for false statements authored by a third party (next page):

> At common law, "primary publishers," such as book, newspaper, or magazine publishers, are liable for defamation on the same basis as authors. Book sellers, news vendors, or other "distributors," however, may only be held liable if they knew or had reason to know of a publication's defamatory content.

*Barrett v. Rosenthal*, 40 Cal.4th 33, 44–45, 146 P.3d 510, 516–17 (Cal. 2006) (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)). For many years, this rule made sense because the publisher of traditional sources can review content <u>before</u> publication—in other words, virtually every word in a newspaper has been or could be reviewed by the publisher before printing. Thus, courts have allowed defamation plaintiffs to sue a <u>publisher</u> even if the content at issue was written by a third party.

In recent years, the Internet has presented a new paradigm wherein people can publish statements <u>by the millions</u> on public message boards virtually instantly, at any time of the day or night, across international boundaries, without any opportunity for pre-publication review by the site operator. Allowing traditional publisher or distributor-

8

based liability against website operators in this context would thus provide an immense incentive for websites to prohibit *any* publication of messages by third parties, thereby reducing the amount of free speech available online.

For that reason, in 1996 Congress enacted the CDA, which prohibits all civil actions that treat an interactive computer service as the "publisher or speaker" of messages transmitted over its service by third parties. This federal statute, which was passed by Congress with the intent to "promote unfettered speech," provides in relevant part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Green v. America Online,* 318 F.3d 465, 470 (3rd Cir. 2003) (noting that the CDA, "'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions - such as deciding whether to publish, withdraw, postpone, or alter content.'")

An outstanding explanation of the CDA and its history is set forth in the California Supreme Court's recent opinion in *Barrett v. Rosenthal*, 40 Cal.4th 33, 146 P.3d 510 (Cal. 2006) cited above. In fact, as the *Barrett* Court recognized, the CDA has been universally interpreted as providing immunity to interactive websites for content created by a third party. *See Barrett*, *supra*, (citing extensive authority).

The *Barrett* Court also observed that in pre-CDA cases, courts would permit liability against *distributors* of defamatory content as long as they were given notice of the plaintiff's claim. *Barrett* acknowledged the logic behind this "notice liability" rule, but concluded that it could not be rationally applied to statements published on the Internet and would defeat the intent of the CDA (next page):

9

> Subjecting service providers to notice liability would defeat "the dual purposes" of section 230 [of the CDA], by encouraging providers to restrict speech and abstain from self-regulation. [Citation]  A provider would be at risk for liability each time it received notice of a potentially defamatory statement in any Internet message, requiring an investigation of the circumstances, a legal judgment about the defamatory character of the information, and an editorial decision on whether to continue the publication.  <u>Although this might be feasible for the traditional print publisher, the sheer number of postings on interactive computer services would create an impossible burden in the Internet context</u>.

*Barrett*, 40 Cal.4th at 45, 146 P.3d at 517 (emphasis added) (internal quotations omitted).

Secondary authority has also explained that:

> [The CDA's] provisions set up a <u>complete shield</u> from a defamation suit for an online service provider, <u>absent an affirmative showing that the service was the actual author of the defamatory content</u>.  Accordingly, a number of courts have ruled that the ISP was immune from liability for defamation where allegedly libelous statements were made available by third parties through an ISP or were posted by third parties on the server's billboards, as the ISP fell within the scope of 47 U.S.C.A. § 230.

Jay M. Zitter, J.D., Annotation—*Liability of Internet Service Provider for Internet or E–mail Defamation* § 2, 84 A.L.R.5th 169 (2000) (emphasis added) (citing Pantazis, Note, *Zeran v America Online, Inc.: Insulating Internet Service Providers From Defamation Liability*, 34 Wake Forest L. Rev. 531 (1999)); *see also Batzel v. Smith,* 333 F.3d 1018, 1027–28 (9th Cir. 2003) (recognizing, "<u>Making interactive computer services and their users liable for the speech of third parties would severely restrict the information available on the Internet</u>.  Section 230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet.") (emphasis added) (quoting *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 983–84 (10th Cir. 2000).

Based on the above, the CDA's effects can be restated a simple rule—the provider of an interactive website cannot be held liable for defamation where the content at issue was created by a third party.  This result is required "even if the ISP retains editorial control over a bulletin board and has knowledge of the defamatory statement, it cannot be

10

held liable under either publisher or distributor liability." Mitchell Waldman, J.D., Am. Jur. 2d *Computers and the Internet* § 77 (2007 Supp.) (citing the CDA).

### D.   Defendants Are Not Liable For Third-Party Content

Applying the CDA to this case is easy. In order for a defendant to avail himself of the CDA's immunity, three elements must be established:

> [1] the defendant must be a provider or user of an interactive computer service;
> [2] the asserted claims must treat the defendant as a publisher or speaker ….; and
> [3] the information must be provided by another information content provider."

*Schneider*, 31 P.3d at 39 (emphasis added).

Here, each element is apparent from the face of the Complaint. First, Xcentric and Magedson are the "providers" of the Rip-Off Report website which is an interactive computer service:

> An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server …" .

*Batzel*, 333 F.3d at 1030 (quoting 47 U.S.C. § 230(f)(2)). This definition includes any website that allows multiple users to connect to it. *See, e.g., Gentry v. eBay, Inc.,* 99 Cal.App.4th 816, 831 & n. 7, 121 Cal.Rptr.2d 703 (2002) (on-line auction website www.eBay.com is an "interactive computer service"); *Schneider*, *supra*, 31 P.3d at 40–41 (same rule).

Second, Plaintiffs' defamation claim (¶ 34) clearly seeks to treat Defendants as the publishers/speakers of defamatory content, stating that they "adopted" statements written by a third party because Defendants refused to remove the statements upon request.

Third, it is undisputed that the allegedly defamatory statements at issue were created by a third party—Spencer Sullivan. According ¶¶ 13–15 of the Complaint, each of the three statements at issue in this case was created by Mr. Sullivan, not by Defendants. As such, Defendants are entitled to CDA immunity and therefore COA's Amended Complaint fails to state a valid claim upon which relief can be granted.

This same rule has been applied in Arizona courts. For example, in *Austin v. Crystaltech Web Hosting*, 211 Ariz. 569, 125 P.3d 389 (App. 2005), the plaintiff, Austin, was the subject of an allegedly defamatory article posted on the website of his competitor, Daniels. Daniels' website was hosted by Crystaltech Web Hosting in Arizona. *See Austin*, 211 Ariz. at 572, 125 P.3d at 392. Austin sued Crystaltech after it refused to remove the allegedly defamatory material posted by Daniels.

Citing the CDA, Crystaltech moved for summary judgment, arguing that it was immune from claims which were based on statements posted by a third party (i.e., Daniels). The trial court <u>agreed</u> and found that Crystaltech was entitled to immunity under the CDA. *See id*.

The Court of Appeals <u>affirmed</u> finding that as the provider of an interactive website, Crystaltech could not be held liable for information posted by a third party; "because the CDA provides immunity to interactive computer service providers, like CrystalTech, we affirm the trial court's grant of summary judgment against Austin." *Id*. at 574. This same result should follow here and this Court should dismiss the Complaint pursuant to Rule 12(b)(6) because it fails to state a claim.

### III. <u>ARGUMENTS RE: ENFORCEMENT OF CANADIAN JUDGMENT</u>

#### A. The Canadian Judgment Is Interlocutory

Unlike many other states that follow the Uniform Foreign Money Judgments Recognition Act, Arizona courts analyze the enforceability of foreign judgments under Sections 481 and 482 of the Restatement (Third) of Foreign Relations Law (1987) (the "Restatement"). *See Alberta Sec. Comm'n v. Ryckman*, 200 Ariz. 540, 545, 30 P.3d 121, 126 (App. 2001). Section 481 of the Restatement explains the circumstances under which a foreign judgment may be recognized in the United States: "(1) Except as provided in § 482, <u>a final judgment</u> of a court of a foreign state granting or denying recovery of a sum of money, establishing or confirming the status of a person, or determining interests in property, is conclusive between the parties, and is entitled to recognition in courts in the United States." (emphasis added)

Comment "e" to Section 481 explains the requirement of finality: "e. **Final judgment**. A final judgment is one that is not subject to additional proceedings in the rendering court other than execution." (emphasis added)  Courts have explained that non-final judgments from other countries are generally *not* entitled to recognition here; "unless the foreign decree is a final adjudication of the matters asserted therein, it is not entitled to comity or res judicata effect, even if it is otherwise a valid decree." *Polgar v. Facacci*, 2 Misc.3d 836, 841, 771 N.Y.S.2d 814, 818 (N.Y.Sup.Ct. 2003) (emphasis added) (citing *Solow Building Co. v. Morgan Guaranty,* 294 A.D.2d 224, 741 N.Y.S.2d 856 (1st Dept. 2002)).

In reviewing the Canadian "judgment" which Plaintiffs seek to enforce here, it is apparent that this is actually a non-final interlocutory *order* granting a preliminary injunction rather than a final judgment of the Canadian Courts.  On its face the document (entitled "ORDER") simply grants an injunction by default but then refers the issue of damages (and presumably liability) to trial.  Because there is no indication that this *order* is final or that the case is not subject to further proceedings, the order is simply not sufficient to receive recognition pursuant to Section 481 of the Restatement.

### B.   The Canadian Judgment is Void For Lack of Personal Jurisdiction

As a separate issue, even if the Canadian order was a final judgment, it would nevertheless not be entitled to recognition in Arizona because Defendants are not subject to personal jurisdiction in Canada.  Section 482 of the Restatement explains this requirement and provides that jurisdiction must be properly established under both the law of the rendering state (Canada) *and* the rules set forth in Section 421 of the Restatement:

> **§ 482. Grounds For Nonrecognition Of Foreign Judgments**
>
> (1) A court in the United States may not recognize a judgment of the court of a foreign state if:
>   (a) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law; or
>   (b) the court that rendered the judgment did not have jurisdiction over the defendant in accordance with the law of the rendering state and with the rules set forth in § 421. (emphasis added)

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

Here, Plaintiffs' Complaint contains virtually no explanation of the basis upon which a Canadian court would have jurisdiction over an Arizona-based website or its Editor, nor does the Canadian order explain the Court's reasons for finding jurisdiction. At best, it appears that Plaintiffs contend the Canadian courts have jurisdiction over Defendants because Plaintiffs reside in Canada and claim to have suffered harm there as a result of material which was posted on Rip-Off Report in Arizona. This theory is not sufficient to confer jurisdiction under either Canadian law, the Restatement, or the laws of the United States.

In terms of Canadian law, courts there have stated: "There is ample authority that where a tort has been wholly committed in another province … and the defendant alleged to have committed the tort resides in that other province and has no real and substantial connection with the forum, then the forum has no jurisdiction over such defendant." *Long v. Citi Club*, 1995 WL 1736745 (Ont. Gen. Div.), 1995 CarswellOnt 3415, [1995] O.J. No. 1411 (emphasis added).

Here, ¶ 12 of the Complaint alleges that the author of the statements at issue (Spencer Sullivan) resides in Tennessee, while Xcentric and Magedson are residents of Arizona. The Rip-Off Report website is also based in Arizona. The only connection this case has with Canada is the fact that Plaintiffs reside there and allege to have suffered harm there. As a matter of Canadian law, this is insufficient to confer jurisdiction over American defendants:

> The plaintiff must do more than allege that he has suffered damage in the forum province (Ontario). In order for Ontario to assume jurisdiction over this defendant, there must exist a substantial connection between Ontario and the defendant, such that it makes it reasonable to infer that the defendant has voluntarily submitted himself or herself to the risk of litigation in the courts of the forum province.

*Long*, 1995 WL 1736745, *3 (emphasis added). The same result follows under United States law; "Courts have insisted upon more than mere access to the website to sustain specific jurisdiction." *Best Van Lines, Inc. v. Walker,* 2004 WL 964009 (S.D.N.Y. 2004);

14

*GTE New Media Services, Inc. v. Bellsouth Corp.,* 199 F.3d 1343, 1349 (D.C. Cir. 2000) ("personal jurisdiction surely cannot be based solely on the ability of [forum] residents to access Defendant's websites.") (emphasis added); *Realuyo v. Villa Abrille,* 2003 WL 21537754 (S.D.N.Y. 2003) (Internet news service not subject to jurisdiction in New York for posting allegedly defamatory article written by another – sheer availability of article over the internet was insufficient for jurisdiction).

Finally, Section 421 of the Restatement provides a similar reasonableness requirement; "(1) A state may exercise jurisdiction through its courts to adjudicate with respect to a person or thing if the relationship of the state to the person or thing is such as to make the exercise of jurisdiction reasonable." None of these standards (Canadian, U.S., or Restatement) permit a foreign Court to exercise jurisdiction over American defendants simply by virtue of the Plaintiff's residence or his claim that harm was felt in his home state. In addition, to the extent that Plaintiffs' jurisdictional theory is founded upon the fact that Defendants have "published" works directed at Canadian residents, this result is contrary to the Communications Decency Act because it would require the Court to treat Defendants as the "speaker or publisher" of material which was posted on a website by a third party. The CDA expressly prohibits this result.

**C.     The Canadian Judgment is Not Entitled to Recognition in the U.S.**

Section 482 of the Restatement cautions:

(2) A court in the United States need not recognize a judgment of the court of a foreign state if: …
    (d) the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States or of the State where recognition is sought; (emphasis added)

All other matters aside—even if the Canadian judgment was final (which it is not), and even if the Canadian Court had personal jurisdiction (which it does not)—the order (injunction) which Plaintiffs seek to enforce here is not entitled to recognition because it is facially repugnant to the laws of the United States. That fact alone warrants this Court's refusal to recognize the Canadian order.

15

First, as noted above, it appears that the Canadian order is essentially a preliminary injunction which requires the pre-trial suppression of speech without any finding that the speech at issue was actually false or defamatory.[1]  Such a pretrial injunction is, in reality, a prior restraint on speech which is presumptively unconstitutional in the United States; "The general rule is that equity does not enjoin libel, rather the only remedy for defamation is an action for damages. <u>There is a heavy presumption that prior restraints on expression are unconstitutional</u>." *Kisser v. Caolition for Religious Freedom,* 1996 WL 147978 (N.D. Ill. 1996).  If speech is to be enjoined, it should only be after a <u>jury</u> has determined that the speech is false and defamatory and only where there has been a showing of no adequate remedy at law, such as where the defendant is insolvent.  *See Kramer v. Thompson,* 947 F.2d 666 (3rd Cir. 1991).  By the same token, when money damages can compensate a plaintiff who claims to be the victim of defamation, no irreparable injury exists and preliminary injunctive relief is *per se* improper.  *See DFW Metro Line Serv. v. Southwestern Bell Telephone*, 901 F.2d 1267, 1269 (5th Cir. 1990).

Consistent with these standards, Comment "b" to Section 481 of the Restatement also explains: "<u>Judgments granting injunctions</u>, declaring rights or determining status, and judgments arising from attachments of property, <u>are not generally entitled to enforcement</u> [in the receiving forum] … ." (emphasis added).

Second, as explained above, the Canadian order/injunction directly conflicts with United States law and policy as embodied in the Communications Decency Act.  For one thing, as a matter of Congressional wisdom, the CDA was intended to encourage free speech by allowing websites to freely publish third-party material without fear of liability.  As part of that choice, Courts have recognized the broad protections of the CDA extend even to claims for injunctive relief.  *See Kathleen R. et al v. City of Livermore*, 87 Cal App.4th 684, 697-98, 104 Cal.Rptr.2d 772, 780-81 (2001) (holding that section 230(c)(1) of the Act prohibited claims for <u>injunctive relief</u> as well as damages)  The Tenth Circuit

---

[1] As noted above, Defendants contend that the bulk of the speech cited in Plaintiffs' Complaint is simply not defamatory as a matter of law and/or that the speech is substantially true.

16

10297-17/DSG/DSG/598184_v2

has also upheld dismissal of state law claims for injunctive relief.  *See Ben Ezra, Weinstein, & Co.*, 206 F.3d at 983-84.

By purporting to enjoin the operation of an <u>American</u> website containing speech authored by an <u>American</u> resident based on the application of Canadian law, the Canadian order ignores and offends these Congressional policies, seeking to treat Defendants as direct publishers of the material authored by Mr. Sullivan.  This result is directly contrary to Congress' stated intent when it enacted the CDA—allowing websites to operate open forums for its users to publish speech without fear of liability.  Canada may choose to adopt its own policies denying its citizens the right to free speech, but it cannot export its laws and enforce those choices upon the United States or its citizens.  *See, e.g., Yahoo!, Inc. v. La Ligue Contre Le Rasism Et L'Antisemitisme*, 433 F.3d 1199, 1214 (9th Cir. 2006) (foreign judgments are not enforceable under Arizona common law if they are repugnant to public policy) (citing *Ryckman*, *supra*, 200 Ariz. at 549)).

## IV. <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request an order dismissing Plaintiffs' Complaint pursuant to Ariz. R. Civ. P. 12(b)(6) on the basis that the pleading fails to state a claim upon which relief can be granted.

DATED this 7th day of August 2007.

**JABURG & WILK, P.C.**

/s/ David S. Gingras
Maria Crimi Speth
David S. Gingras
Attorneys for Defendant Xcentric
Ventures, L.L.C. and Ed Magedson

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

10297-17/DSG/DSG/598184_v2

**Certificate of Service**

I hereby certify that on August 7, 2007, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Donald Joseph Karl
> Andre H. Merrett
> Deana S. Peck
> Quarles & Brady, LLP
> One Renaissance Square
> Two North Central Avenue
> Phoenix, Arizona 85004
> Attorneys for Plaintiffs

And a copy of the foregoing hand delivered on August 7, 2007, to:

> Honorable Frederick J. Martone
> United States District Court
> District of Arizona

s/Janet A. Sauer

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

18

10297-17/DSG/DSG/598184_v2