**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Global Royalties, Ltd., et al., | ) | No. 07-956-PHX-FJM |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| Xcentric Ventures, LLC, et al., | ) | |
| Defendants. | ) | |

Global Royalties is a Canadian corporation, and Brandon Hall is its principal (collectively, "Global" or "plaintiff"). Xcentric Ventures is an Arizona limited liability company, and Edward Magedson is its manager (collectively, "defendant"). Plaintiff seeks enforcement of an order issued by a Canadian court and asserts a defamation claim. We have before us defendant's motion to dismiss for failure to state a claim (doc. 13), plaintiff's response (doc. 16), and defendant's reply (doc. 17). For the reasons below, the motion is granted with leave to amend.

**I.**

The complaint alleges these facts. Defendant operates a website called Ripoff Report (www.ripoffreport.com), on which consumers are invited to post complaints about companies that they believe have wronged them. Global brokers investments in gemstones. On March 27, 2006, Ripoff Report visitor Spencer Sullivan, who is not a party to this action, posted a

1    message on the website referring to Global's operation as a "scam" ("first statement").

2    Complaint, Ex. A at 6.

3        Sullivan posted a second entry on June 8, 2006, which he said was in response to a

4    letter "threatening legal action" from plaintiff's counsel. Id. at 7. Sullivan wrote that he was

5    not aware of any bad business practices on the part of Global itself, but that two individuals

6    "involved with" Global, who are also not parties to this action, had written bad checks and

7    otherwise treated him dishonorably ("second statement"). Id. Sullivan added that anyone

8    looking to invest in gemstones should first call the Royal Canadian Mounted Police,

9    Commercial Crime Unit, whose number he supplied along with a contact.

10       Sullivan posted a final entry about Global on June 16, 2006 ("third statement").

11   Sullivan again claimed that he had been "threatened" by plaintiff's counsel, who objected to

12   his suggestion that potential gemstone investors contact the Canadian authorities. Id. at 8.

13   His message ends, "I think that any upstanding commercial operation could bear the scrutiny

14   of a crime unit without any issue." Id. At some point, Sullivan allegedly contacted

15   defendant and asked that his entries be removed from the website, but defendant refused.

16   Complaint ¶ 19.

17       On July 24, 2006, plaintiff sued Sullivan and defendant in the Superior Court of

18   Justice in Ontario, Canada, for defamation. Defendant was served but did not appear. On

19   February 9, 2007, Sullivan and defendant were served with notice of plaintiff's intent to seek

20   injunctive relief from the Ontario court. Again, defendant did not appear. On February 26,

21   the Ontario court found defendant in default and issued an order requiring defendant to

22   remove any references to plaintiff, including the three statements, from its website;

23   prohibiting defendant from "posting any further defamatory messages" concerning plaintiff;

24   and referring the issue of damages to trial. Complaint, Ex. A at 3–4.

## II.

26       We first address the Ontario court's order. Absent a treaty provision, enforcement of

27   international judgments is a matter of state law. The law of the state in which enforcement

28   is sought governs. Yahoo! Inc. v. La Ligue Contre Le Recisme, 433 F.3d 1199, 1212 (9th

1   Cir. 2006). In the absence of contrary authority, Arizona courts follow the Restatement of

2   the Law. Bank of Am. v. J. & S. Auto Repairs, 143 Ariz. 416, 418, 694 P.2d 246, 248

3   (1985).

4       Arizona courts have relied on two different Restatements that address the enforcement

5   of international judgments. See Alberta Sec. Comm'n v. Ryckman, 200 Ariz. 540, 30 P.2d

6   121 (Ct. App. 2001) (relying on the Restatement (Third) of the Foreign Relations Law of the

7   United States (1987)); Rotary Club of Tucson v. Chaprales Ramos de Pena, 160 Ariz. 362,

8   773 P.2d 467 (Ct. App. 1989) (relying on the Restatement (Second) of Conflict of Laws

9   (1971)). The two are similar in principle; however, the Foreign Relations Restatement

10  presents a more complete and useful framework for analyzing foreign-country judgments.

11  Alberta, 200 Ariz. at 545, 30 P.3d at 126.

12      Section 481 of the Foreign Relations Restatement provides a general rule for

13  recognition, a prerequisite to enforcement:

14          Except as provided in § 482, a final judgment of a court of a foreign state

15          granting or denying recovery of a sum of money, establishing or confirming

16          the status of a person, or determining interests in property is conclusive

17          between the parties, and is entitled to recognition in courts in the United

18          States.

19  Restatement (Third) of the Foreign Relations Law of the United States § 481(1) (1987).

20  Under this section, the Ontario court's order is not entitled to enforcement. First, it is not a

21  "final judgment." A final judgment is "one that is not subject to additional proceedings in

22  the rendering court other than execution." Id. cmt. e. The Ontario court ordered "that the

23  issue of damages be referred to trial." Thus, the action is subject to additional proceedings,

24  and the judgment is not final. Second, a judgment granting an injunction is not among those

25  listed as entitled to recognition. Id.; see also id. cmt. b ("Judgments granting injunctions . . .

26  are not generally entitled to enforcement.").

27      Dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P., is appropriate where a plaintiff

28  seeks enforcement of a foreign judgment that is not entitled to recognition as a matter of law.

1   See British Columbia v. Gilbertson, 597 F.2d 1161, 1162 (9th Cir. 1979).  Accordingly, we

2   dismiss plaintiff's claim for enforcement of the Ontario court's order.

3                                            **III.**

4          We next address the defamation claim.  Defendant contends that it is immune under

5   the Communications Decency Act ("CDA"), 47 U.S.C. §§ 230 et seq.  Whether it is proper

6   to raise CDA immunity in a Rule 12(b)(6) motion is an open question.  Compare Doctor's

7   Assocs., Inc. v. QIP Holders, LLC, 2007 WL 1186026, slip op. at 2 (D. Conn. Apr. 19, 2007)

8   (improper), with Doe v. Bates, No. 5:05-CV-91, 2006 WL 3813758, at *8–9 (E.D. Tex. Dec.

9   27, 2006) (proper).  We take a practical approach.  If we thought plaintiff were procedurally

10  disadvantaged, we would deny defendant's motion and require one under Rule 56.  However,

11  given the allegations, the application of the CDA is a question of law and will not be affected

12  by discovery.  Whether we construe this motion as one under Rule 12(b)(6) or as an

13  unenumerated 12(b) motion, we agree that the CDA defeats the defamation claim.

14         At common law, publishers are generally liable for the defamatory statements

15  authored by third-parties.  In cyberspace, the "publisher" label becomes more difficult to

16  apply because a third-party can unilaterally post content on another's website.  Congress

17  became concerned that website operators would not monitor posted content, lest the

18  monitoring activity mark them as publishers.  Batzel v. Smith, 333 F.3d 1018, 1029 (9th Cir.

19  2003).  Born largely of this concern, the CDA nullifies the common law rule and broadly

20  immunizes website operators from liability for third-party content:

21         No provider or user of an interactive computer service shall be treated as the

22         publisher or speaker of any information provided by another information

23         content provider.

24  47 U.S.C. § 230(c)(1).

25         Importantly, the CDA does not protect a website operator who is itself an

26  "information content provider" with respect to the posted content.  Batzel, 333 F.3d at 1031.

27  An "information content provider" is defined by the statute as "any person or entity that is

28  responsible, in whole or in part, for the creation or development of [the content]."  47 U.S.C.

§ 230(f)(3). Essentially, the CDA protects website operators from liability as publishers, but not from liability as authors.

The three allegedly defamatory statements at issue were written by Spencer Sullivan, not defendant.  Plaintiff contends, however, that defendant "adopted" Sullivan's statements by failing to remove them after Sullivan disavowed their contents and asked that they be taken down, and that this "adoption" is tantamount to creation or development.  Yet, it is "well established that notice of the unlawful nature of the [content] provided is not enough to make it the [website operator's] own speech."  Universal Commc'n Sys., Inc. v. Lycos, 478 F.3d 413, 420 (1st Cir. 2007).  The United States Court of Appeals for the Ninth Circuit has acceded to this position, notwithstanding the troubling result that CDA immunity leaves website operators "little incentive to take . . . material down even if informed that the material is defamatory."  Batzel, 333 F.3d at 1031 & n.19.  Defendant's failure to remove the three statements was an "exercise of a publisher's traditional editorial functions" and does not defeat CDA immunity.  Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997).

Plaintiff's reliance on Hy Cite Corp. v. Badbusinessbureau.com, 418 F. Supp. 2d 1142 (D. Ariz. 2005), is unavailing.  Hy Cite involved a defamation claim against this same defendant, who claimed CDA immunity and moved to dismiss.  The court denied the motion because plaintiff alleged that defendant had produced editorial comments, titles, and other original content contained in the allegedly defamatory postings.  Id. at 1148–49.  Here, plaintiff has not made comparable allegations of co-authorship.  The most plaintiff alleges is that defendant supplied a list of titles from which Sullivan picked the phrase "Con Artists" to label the first statement.  Complaint ¶ 14.  This minor and passive participation in the development of content will not defeat CDA immunity, which can even withstand more active participation.  See Batzel, 333 F.3d at 1035 ("[A] central purpose of the [CDA] was to protect from liability some service providers and users who take some affirmative steps to edit the material posted.").

If it was an unintended consequence of the CDA to render plaintiffs helpless against website operators who refuse to remove allegedly defamatory content, the remedy lies with

1   Congress through amendment to the CDA.  See Batzel, 333 F.3d at 1031 n.19.

2                                          **IV.**

3          For the foregoing reasons, IT IS ORDERED GRANTING Xcentric Ventures, LLC,

4   and Edward Magedson's motion to dismiss (doc. 13).  Because we do not know whether

5   plaintiff can state a claim, plaintiff shall have to and including November 1, 2007, within

6   which to file an amended complaint, absent which the clerk shall enter judgment without

7   further order of the court.

8          DATED this 10th day of October, 2007.

9

10

11                                    Frederick J. Martone
                                      Frederick J. Martone
                                      United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28