Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391
TELEPHONE 602.229.5200

André H. Merrett (AZ Bar No. 020889)
amerrett@quarles.com

Deana S. Peck (AZ Bar No. 004243)
dpeck@quarles.com

Attorneys for Plaintiffs Global Royalties, Ltd.
and Brandon Hall

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Global Royalties, Ltd., a Canadian corporation; Brandon Hall, a Canadian citizen, | NO. CV 07-0956-PHX-FJM |
| Plaintiffs, | **PLAINTIFFS' RESPONSIVE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| vs. | |
| Xcentric Ventures, L.L.C., an Arizona limited liability company d/b/a ripoffreport.com and/or badbusinessbureau.com; Ed Magedson and Jane Doe Magedson, husband and wife, | |
| Defendants. | |

Global Royalties, Ltd. and Brandon Hall (collectively "Global Royalties" or "Plaintiffs"), hereby move the court to deny Defendants Xcentric Ventures L.L.C.'s ("Xcentric") and Edward Magedson's ("Magedson" and together with Xcentric "Defendants") Motion to Dismiss.

1

## I.      THE ALLEGED FACTS

2

The factual allegations of the First Amended Complaint ("FAC") constitute the

3

basis upon which Defendants' Motion to Dismiss ("Motion") must be tested.    The

4

standard, as recently articulated by the Supreme Court, is:

5

6

7

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not
> need detailed factual allegations . . . , [its] [f]actual allegations must be
> enough to raise a right to relief above the speculative level, . . . on the
> assumption that all of the allegations in the complaint are true (even if
> doubtful in fact).

8

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

9

The FAC alleges that Defendants Xcentric Ventures, L.L.C. and Ed Magedson

10

operate an Internet website with the domain name "ripoffreport.com."    FAC ¶¶ 3 - 4.

11

Defendants encourage visitors to the ripoffreport.com website to post numerous and

12

repeated complaints about businesses or individuals.    FAC ¶ 11.   Those who post a

13

complaint on the ripoffreport.com website must answer several questions created and

14

developed by Xcentric and Magedson.   FAC ¶ 18.   Those who post a complaint are also

15

required to select a category under which to characterize the business or individual that is

16

the subject of the complaint *See* FAC at ¶ 19.

17

On or about March 27, 2006, non-party Spencer Sullivan posted a statement on

18

ripoffreport.com accusing Plaintiffs of operating a scam involving the sale of gem stones

19

(the "First Statement").   FAC ¶ 15.   Plaintiff Brandon Hall discovered the First Statement

20

on May 15, 2006, when it was brought to his attention by a customer.   FAC ¶ 17.

21

The First Statement was posted under a category titled "Con Artists" and thereby

22

accused Plaintiffs of being "Con Artists" in addition to the accusations contained in the

23

First Statement itself.   FAC ¶ 16.   Sullivan selected the "Con Artists" category from a list

24

of available titles on the ripoffreport.com website.   FAC ¶ 19.   Xcentric and Magedson

25

were solely responsible for the creation and development of the category titled "Con

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Artists" and are thus responsible for the defamatory statement that Plaintiffs are "Con Artists." FAC ¶¶ 20 - 21.

The "Con Artists" label precedes the First Statement and also contaminates "Updates" posted under the First Statement. On or about June 8, 2006, Sullivan posted an Update to the First Statement on ripoffreport.com in which he claimed that individuals associated with Plaintiffs were dishonorable and had engaged in criminal acts (the "Second Statement"). FAC ¶ 22. In addition, and among other things, Sullivan complained in the Second Statement that Plaintiffs (through counsel) had "threatened" him with legal action and advised anyone considering doing business with Plaintiffs to first contact the Royal Canadian Mounted Police ("RCMP") Commercial Crime Unit. *Id.*

Spencer posted another Update on or about June 16, 2006 (the Third Statement"). FAC ¶ 23. In the Third Statement, Sullivan stated that Plaintiffs (through counsel) had threatened him again and advised anyone considering doing business with Plaintiffs to first contact the RCMP. *Id.* Sullivan further stated that "I would think that any upstanding commercial operation could bear the scrutiny of a crime unit without any issue." *Id.*

At some point, Sullivan contacted the Defendants and asked them to remove his statements from the ripoffreport.com website, but Defendants refused. FAC ¶ 25 - 26. (Plaintiffs contend, and will argue below, that Defendants' refusal to take down the statements as requested by their original provider created a defining moment, at which time the statements were no longer "provided" by a third party but, instead, became the statements of Xcentric and Magedson.)

Defendants had their own pecuniary interest in refusing to take down Spencer's defamatory statements. Through ripoffreport.com, they encourage visitors to post numerous and repeated complaints about businesses. FAC ¶ 11. Defendants then use the

posted complaints as leverage to coerce businesses to pay to participate in Xcentric's "Corporate Advocacy Program," which purports to provide assistance in investigating and resolving posted complaints.  FAC ¶ 13.  Only after a business "enrolls" in the Corporate Advocacy Program will Defendants allegedly "verify" posted statements, determine their truthfulness and expose those that are posted "erroneously or maliciously."  FAC, Ex. 1, p. 3.  The fees for "enrolling" in this program "are based upon the number of Reports filed, the number of offices you have, and/or the size of an average sale."  *Id.*  There is also a flat "set-up fee" levied to offset the costs of programming and "contract legalities."  *Id.*  It is an integral part of Ripoff's "Corporate Advocacy Program" that "ALL reports, rebuttals and updates ever filed" remain posted on the ripoffreport.com website.  *See id.* at p. 6.

## II.     THE FIRST STATEMENT IS NOT TIME BARRED.

Xcentric's defamatory statement - - that Global Royalties is a Con Artist - - was published in a manner likely to be concealed from Global Royalties.  Accordingly, the discovery rule applies in this case and the applicable statute of limitations was tolled until Global Royalties discovered or reasonably should have discovered Xcentric's defamatory statement.

In *Clark v. Airesearch Manu. Co. of Ariz.*, the court held that the discovery rule should be applied in those situations in which "the defamation is published in a manner in which it is peculiarly likely to be concealed from the plaintiff . . ."  138 Ariz. 240, 242, 673 P.2d 984, 986 (App. 1983)  The court articulated this rule after considering the interplay between the policy behind statutes of limitations (to discourage the presentation of stale claims and to encourage diligence in the bringing of actions) and the need to preserve the injured party's rights in limited cases where defamatory statements were likely to be kept secret from the plaintiff.  *Id.*  In the latter case, applying the discovery

rule is appropriate. The case at bar involves one of those limited cases where Xcentric's defamatory statement was likely to be kept secret from Global Royalties.

As Xcentric boasts, "Ripoff Report® is a worldwide consumer reporting Web site and publication, by consumers, for consumers to file and document complaints about companies or individuals." *See* FAC at ¶9. The "service" Ripoff Report® purports to provide to consumers is the provision of information to be used by consumers in making a decision to do business with an entity or individual. According to Xcentric, its reports are discovered by "millions of *consumers*" (emphasis added) who visit the site to search for or post complaints about a business or individual. *See* FAC at ¶12. Thus, as Xcentric intends, consumers wishing to inquire as to the integrity of a business or individual prior to doing business with them, or consumers seeking to complain about a business or individual after doing business with them are the members of the public who are likely to visit the site and discover its reports.

On the other hand, the subject of a report is not likely to discover the report unless it constantly monitors the internet for that purpose or someone brings the report to the subject's attention. Reports posted on Xcentric's website are likely to be kept secret from the unwitting subjects of those reports, unless, out of a sense of extreme paranoia, a business or individual regularly monitors the internet for the posting of information about them. For this reason, the Court should conclude that the application of the discovery rule is appropriate here.

Global Royalties did not discover Xcentric's defamatory statement until May 15, 2006, when one of its customer's brought the statement to its attention. FAC at ¶17. Until that time the statement was concealed from Global Royalties and Global Royalties had no reason to believe that such a statement existed. Under these circumstances, Global Royalties' defamation claim is not time barred as far as the First Statement is concerned.

Additionally, even if the First Statement was time barred, the Second and Third Statements published June 8, 2006 and June 16, 2006, respectively, remain and present viable defamation claims. Defendants do not repeat their earlier contentions that the Second Statement and Third Statement are not defamatory. Perhaps this is so because they know that now is not the time for such an argument. It is well settled that the question whether the meaning conveyed by a statement is defamatory is a question for the jury. *Yetman v. English*, 168 Ariz. 71, 79, 811 P.2d 323, 331 (1991); *Dube v. Likins*, 216 Ariz. 406, 167 P.3d 93, 106 (Ct. App. 2007). While it is a question of law for the court to determine whether a statement is capable of defamatory meaning (*see id.*), the statements in issue here present sufficient fodder to reach the jury on the question whether they are, in fact, defamatory.

## III. THE COMMUNICATIONS DECENCY ACT DOES NOT BAR THE CLAIM.

### A. Defendants Are Not Entitled to Immunity Under the Communications Decency Act, Because They Were Responsible, in Whole or in Part, for the Creation or Development of the Defamatory Content at Issue.

In their effort to rely on the Communications Decency Act, 47 U.S.C. §§ 230 *et seq.* ("CDA"), Defendants ignore certain Ninth Circuit precedents that deprive them of the immunity otherwise conferred by that Act.

*First*, Defendants utterly ignore the Ninth Circuit's most recent published CDA case, *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC,* 489 F.3d 921 (9th Cir. 2007). In *Roommates*, plaintiff sued the operator of an online roommate-matching website, alleging that the operator violated the Fair Housing Act (FHA) and other state laws. The plaintiff complained that the operator of the website violated the FHA by (1) posting questionnaires on its website and requiring individuals who wanted to take advantage of its services to complete them; (2) posting and distributing by email its

members' profiles and (3) posting information its members provided on a form entitled "Additional Comments." *Id.* at 926. In reviewing the trial court's granting of the operator's motion for summary judgment on the basis of immunity under the CDA, the Ninth Circuit considered whether by engaging in the above-referenced activity, the operator was "responsible, in whole or in part, for the creation or development of [the] information." In other words, the court sought to determine whether the operator was an information content provider and, accordingly, not entitled to immunity under the CDA. The court answered this question in the affirmative.

The CDA affords providers of interactive computer services immunity from liability for content created by third parties. *Roommates* 489 F.3d at 925; *see also Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003); and *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ("Critically, however, §230 limits immunity to information 'provided by another information content provider.'") An information content provider is defined to mean any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the internet or any other interactive computer service. *Roommates*, 489 F.3d at 925. In concluding that the operator was an information content provider who was not entitled to CDA immunity, the *Roommates* court found that the operator's responsibility for creating or developing the forms of and answer choices for the questionnaires complained of to be the salient factor. 489 F.3d at 926.

Likewise, Defendants are responsible for the creation or development of the defamatory content. The defamatory content complained of in the FAC is Xcentric's statement that Global Royalties is a "Con Artist." It is beyond dispute that as to this content, Xcentric is responsible for its creation and development. Individuals who post a complaint on Xcentric's ripoffreport.com website must answer several questions created

and developed by Defendants.   FAC at ¶18.   Additionally, individuals who post a complaint on Xcentric's ripoffreport.com website are required to select a category under which to identify the business entity or individual about whom the complaint is posted. *See* FAC at ¶19.  Among the categories available to those posting on Xcentric's website is the category "Con Artists" which was created solely by Defendants.  Thus, when Sullivan selected the "Con Artists" category, Defendants became responsible, in whole or in part, for the defamatory content contained in the First Statement and, thereafter, the Second and Third Statements which were also contaminated by the "Con Artists" label. Consequently, the CDA does not afford immunity to the Defendants because they were information content providers.

Second, while Defendants do cite and rely on *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), they ignore the fact that the *Roommates* court determined that *Carafano* would not control in a situation -- as alleged in this case -- in which the website operator "actively encourage[s], solicit[s] and profit[s] from the tortious and unlawful communications of others."  489 F.3d at 928.

After concluding that the operator was an information content provider, the *Roommates* court considered whether the CDA would exempt the operator from liability for publishing and distributing member profiles that were generated from the members' answers to the operator's questionnaires.  The court rejected the operator's argument that *Carafano* settled the issue, finding *Carafano* to be distinguishable on the basis of a significant factor: the third-party that provided the defamatory content in *Carafano* was not solicited to do so by the operator of the website.  *Id*.  The operator, on the other hand, solicited the very information complained of as violating the FHA.  As the court stated: "We are not convinced that *Carafano* would control in a situation where defamatory,

private or otherwise tortious or unlawful information was provided by users in direct response to questions and prompts from the operator of the website." *Id.*

To illustrate its point, the *Roommates* court posed a hypothetical in which a website operator - - www.harrassthem.com - - encouraged its visitors to provide sensitive and / or defamatory information about others to be posted online for a fee.  In addition, the visitor would be encouraged by the operator to post dirt on a victim without regard to its truthfulness or accuracy.  *Ibid.*  Under these circumstances, the court doubted whether *Carafano* would protect the hypothetical website operator.  Because the operator could be considered to have been responsible, in whole or in part, for the creation of the content, by virtue of its providing a forum designed to publish the defamatory information, the CDA would not provide immunity.  In this regard the *Roommates* court wrote:

> "*Carafano* did not consider whether the CDA protected such websites, and we do not read that opinion as granting CDA immunity to those who actively encourage, solicit and profit from the tortious and unlawful communications of others."

*Id.*  In other words, where the website operator encourages, solicits and profits from the tortious and unlawful communications of others, *Carafano* cannot be relied on as authority for the application of CDA immunity.

Like the www.harrassthem.com operator, Xcentric and Magedson actively solicited Sullivan to characterize Global Royalties as "Con Artists."   Additionally, like the hypothetical www.harrassthem.com operator, Xcentric and Magedson seek to profit from the posting of defamatory information about business entities or individuals.  Defendants use the posted complaints as leverage to coerce businesses to pay to participate in Xcentric's "Corporate Advocacy Program," which purports to provide assistance in investigating and resolving posted complaints.  *See* FAC at ¶13.

1   Based on the foregoing, Defendants would not be entitled to immunity under the

2   CDA.  Defendants were information content providers for whom immunity is not granted

3   by the statute.

4

5   **B.     Consistent with the Logic of *Batzel*, Defendants' Refusal  of Spencer's Direction to Take Down His Postings Should Deprive Defendants of CDA Immunity.**

6

7   Another, and independent, reason why Defendants are not entitled to CDA

8   immunity is that they refused to take down the statements in issue after they were

9   requested to do so *by the very person who posted them.*  Defendants disregard an aspect of

10  the Ninth Circuit's decision in *Batzel*, by logical extension, would deny CDA immunity in

11  such a circumstance.

12  In *Batzel*, Smith undertook a computer search for websites concerning stolen art

13  work and thus located the Museum Security Network (the "Network") website.  He then

14  sent an email to the Network claiming that Batzel was a descendant of "one of Adolph

15  Hitler's right-hand men" and that she had inherited stolen art that was looted during

16  World War II.  333 F.3d at 1021.  The sole operator of the Network was Cremers, who

17  posted Smith's email message on the website.   *Id.* at 1022.   Batzel sued Smith and

18  Cremers for defamation.

19  In our case, Defendants rely on an earlier portion of the *Batzel* opinion.  They rely

20  on the court's conclusion that Cremers's minor alterations of Smith's email prior to its

21  posting and his selection of it for posting on the Network website would not make him the

22  "provider" of the challenged content and thus would not deprive him of CDA protection.

23  But, the opinion does not stop there.  To the contrary, the Ninth Circuit continued:

24          In most cases our conclusion that Cremers cannot be considered a content provider would end matters, but this case presents one twist on the usual § 230 analysis: Smith maintains that he never "imagined [his] message would be posted on an international message board or [he] never would have sent it in the first place."   The question thus becomes whether Smith

25

26

can be said to have "provided" his e-mail in the sense intended by § 230.  If the defamatory information is not "*provided* by another information content provider," then § 230 does not confer immunity on the publisher of the information.

*Id.* at 1032 (emphasis in original).  To be "provided" in the sense required for CDA immunity, the third-party information must be "provided *for use on the Internet* or another interactive computer service." *Id.* at 1033 (emphasis in original).

Cremers argued that it was irrelevant that Smith did not intend his message to be posted on the website because "the § 230(c)(1) immunity should be available simply because Smith was the author of the e-mail, without more." *Id.*  The Ninth Circuit disagreed.  *Id.*  The court rejected Cremers's argument because it concluded that such a broad interpretation of CDA immunity was not consistent with Congress's expressly stated purposes in adopting § 230:

Free speech and the development of the Internet are not "promote[d]" by affording immunity when providers and users of "interactive computer service[s]" knew or had reason to know that the information provided was not intended for publication on the Internet.

*Id.* at 1033-34.  Indeed, the *Batzel* court concluded that immunizing computer service providers or users from liability for content they know or have reason to know is not intended for publication:

[I]nterferes with Congress's objective of providing incentives for providers and users of interactive computer services to remove offensive material, especially obscene and defamatory speech.  Far from encouraging such actions, immunizing a publisher or distributor for including content not intended for Internet publication increases the likelihood that obscene and defamatory material will be widely available.

*Id.* at 1034.

Relying on this policy analysis, the *Batzel* court held that a service provider or user (such as ripoffreport.com) qualifies for immunity under § 230(c)(1) only when the third party furnished the information in question "under circumstances in which a reasonable person in the position of the service provider or user would conclude that the information

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

was provided for publication on the Internet or other 'interactive computer service.'" *Id.*

In *Batzel*, the third party (Smith) provided the content, but allegedly never meant for it to be published on the defendant's website.  In our case, the third party (Spencer) originally provided the content for publication, but later directed that it be taken down and published no more.  Defendants refused.  All of the policy reasons considered by the Ninth Circuit in *Batzel* apply equally in this case to deny CDA immunity to a website operator that refuses to accede to a direction -- made by the original content provider -- that his content be taken down.  In neither case is the content intended (or any longer intended) for publication.  Therefore, under *Batzel,* the consequence of refusing that request should be loss of CDA immunity.  *Accord see Carafano, supra,* 339 F.3d at 1124 (noting that § 230 immunity applies "so long as a third party *willingly* provides the essential published content") (emphasis added).

Giving effect to this logical extension of the *Batzel* court's holding is not inconsistent with *Universal Communication Sys., Inc. v. Lycos,* 478 F.3d 413, 420 (1st Cir. 2007), and *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  In its October 10, 2007 Order, this Court cited *Universal* for the proposition that notice of the unlawful nature of third party content is not enough to make it the website operator's own speech.  (Doc. # 20 at 5:6-9.)  And, *Zeran* was cited for the proposition that a defendant's failure to remove challenged content is an exercise of a publisher's traditional editorial functions and does not defeat CDA immunity.  (Doc. # 20 at 5:12-14.)  But, the facts in those cases were different.

As far as the reported opinions disclose, there was no demand by the original content provider in either *Universal* or *Zeran* that the challenged content be taken down.  In fact, in *Zeran*, it is clear that the demand for removal was made by the defamed plaintiff (129 F.3d at 329), rather than the unidentified (and apparently unidentifiable)

content provider.  This is a significant factual difference that logically leads to a different legal result in terms of the policies that the CDA was intended to foster.  In *Zeran*, the Fourth Circuit was concerned that, if computer service providers faced potential liability each time they received notice of a potentially defamatory statement  -- "*from any party concerning any message*" -- they would confront the prospect of having to make "a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision" whether to risk liability by continuing to publish the information.  129 F.3d at 333 (emphasis added).  Given the risks involved, the *Zeran* court was concerned that there would be a natural incentive to remove the information upon notification, whether the contents were defamatory or not, and thus a chilling effect on the freedom of Internet speech.  *Id.*

Significantly, none of these problems arise when CDA immunity is denied  to website operators who refuse a request by the original provider of the challenged content to take it down.  In that limited circumstance, the website operator is not "caught in the middle" with the Herculean job of attempting to make a legal judgment call on the veracity of someone else's content in the blink of an eye.  In that limited circumstance, there is no "middle" in which to be caught; the speaker has simply withdrawn his speech.

In any event, in *Batzel,* the Ninth Circuit clearly held that CDA immunity is available only when a third party content provider furnishes information "under circumstances in which a reasonable person in the position of the service provider or user would conclude that the information was provided for publication on the Internet or other 'interactive computer service'."  333 F.3d at 1034.  When a website operator is directed by the very provider of posted content to remove it from the website, the website operator is on notice that publication is no longer intended.  Thus, under the allegations in this

case, defendants' denial of Spencer's request that his statements be withdrawn from publication should deprive Defendants of CDA immunity.

## IV.   CONCLUSION

In *Roommates*, the Ninth Circuit clarified that the CDA would not necessarily shield website operators that "actively encourage, solicit and profit from the tortious and unlawful communications of others."   489 F.3d at 928.   The factual allegations here present just such a case.  Here, Defendants do not act as a neutral purveyor of content on the Internet.  Instead, their profiteering motive prompts them to encourage the posting of defamatory statements by others and motivates their refusal to take such statements down when the original provider no longer intends for them to be published.  For these, and the other reasons discussed above, Defendants' Motion to Dismiss should be denied.

If, however, the Court determines to grant Defendants' motion, Plaintiffs request that the Court make clear in its order that the ruling is not intended to have *res judicata* effect upon Plaintiffs' future suit seeking recognition and enforcement of a final judgment it obtains in its prior action filed in the Ontario Superior Court of Justice, Case No. 06-CV-315577PD2, upon conclusion of the trial on damages in that Canadian action. Previously, this Court dismissed Plaintiffs' claim seeking enforcement of a liability order entered in the Canadian action on the ground that the order was not final.   Once the Canadian action is reduced to a final judgment on both liability and damages, it would be unduly prejudicial to preclude Plaintiffs from seeking its enforcement here on the basis of *res judicata*.   Alternatively, Plaintiffs should be permitted to seek a stay of this action (including a ruling on Defendants' motion) pending entry of final judgment in the Canadian action and pending further order of this Court.

1    RESPECTFULLY SUBMITTED this 30th day of November, 2007.

2

3                         QUARLES & BRADY STREICH LANG LLP
                          Renaissance One
4                         Two North Central Avenue
                          Phoenix, AZ  85004-2391
5

6                         By ____s/André H. Merrett_____
                              André H. Merrett
7                             Deana S. Peck

8                         Attorneys for Plaintiffs Global Royalties, Ltd.
                          and Brandon Hall
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on November 30, 2007, I electronically transmitted the

attached document to the clerk's Office using the CM/ECF System for filing.

4

Copy mailed to:

5

6    Honorable Frederick J. Martone
     United States District Court
7    Sandra Day O'Connor U.S. Courthouse, Suite 526
     401 West Washington Street, SPC 62
8    Phoenix, AZ  85003

9

10

11   s/Lisa M. Fox_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26