**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Global Royalties, Ltd., et al., | ) | No. CV-07-0956-PHX-FJM |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| Xcentric Ventures, LLC, et al., | ) | |
| Defendants. | ) | |

In our order of October 10, 2007 (doc. 20), we granted defendants' motion to dismiss with leave for plaintiffs to amend the complaint. Plaintiffs filed an amended complaint (doc. 22) on November 1, 2007. Now the court has before it defendants' motion to dismiss the first amended complaint (doc. 23), plaintiffs' response (doc. 25), and defendants' reply (doc. 27 ex. A). The court also has before it plaintiffs' motion to stay (doc. 28), defendants' response (doc. 29), and plaintiffs' reply (doc. 30). For the following reasons, defendants' motion to dismiss the first amended complaint is granted, and plaintiffs' motion to stay is denied.

**I**

This is a defamation action. Plaintiffs ("Global") broker investments in gemstones. Defendants operate a website called Ripoff Report (www.ripoffreport.com), where visitors are invited to post consumer complaints. On March 27, 2006, Ripoff Report visitor Spencer

Sullivan, who is not a party to this action, posted a message on the site referring to Global's operation as a "scam." Am. Complaint at 3. The amended complaint alleges that consumers who post on defendants' site "must answer several questions created and developed by [defendants]." Id. at 4. The complaint gives only one example: When posting on defendants' site, consumers are required to chose a "category" with which to label their message. For the first statement, Sullivan chose "Con Artists" from a list. Id. Further, plaintiffs allege that defendants encourage defamatory postings in order to use them as leverage "to coerce businesses and individuals to pay for [defendants'] Corporate Advocacy Program, which purports to provide assistance in investigating and resolving the posted complaints." Id. at 3.

Sullivan posted a second entry on June 8, 2006, which he said was in response to a threat of legal action from plaintiffs' counsel. Id. at 4. Sullivan wrote that he was not aware of any bad business practices on the part of Global itself, but that two individuals "involved with" Global had treated him dishonorably and had engaged in criminal acts. Id. Sullivan added that anyone looking to invest in gemstones should first call the Royal Canadian Mounted Police, Commercial Crime Unit.

Sullivan posted a third and final entry about Global on June 16, 2006. He again claimed that he had been "threatened" by plaintiffs' counsel, who advised him to discontinue the postings. Id. at 4–5. His message ends, "I think that any upstanding commercial operation could bear the scrutiny of a crime unit without any issue." Id. at 5. At some point, Sullivan allegedly contacted defendants and asked that his entries be removed from the website, but defendants refused. Id.

**II**

In our order of October 10, 2007, dismissing the original complaint, we concluded that plaintiffs' defamation action was barred by the Communications Decency Act ("CDA"), 47 U.S.C. §§ 230, 560–61. At common law, publishers are liable along with authors for defamatory content. The CDA immunizes website operators ("providers of an interactive computer service") by exempting them from the publisher role:

- 2 -

>No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1). Defendants contend that the allegations of the amended complaint still do not overcome CDA immunity.

### III

Plaintiffs contend that CDA immunity does not protect defendants because they failed to remove the defamatory content after Sullivan, the author, asked them to do so. They rely principally on Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003). In Batzel, an individual sent a defamatory e-mail to a private organization that added the contents to its website. Id. at 1021–22. The author of the message claimed that he never intended its publication on the internet. In addressing the impact on the website operator's liability, the court turned to the statute. Under 230(c)(1), a website operator is not treated as the publisher or speaker "of any information *provided* by another information content provider." (emphasis added). The court concluded that "provided" means "provided for publication," so a website operator cannot disclaim liability for content that the author never intended to post. Id. at 1034. Here, plaintiffs acknowledge that Sullivan initially provided his statements for publication. But they contend that once Sullivan requested their removal, the statements were no longer "provided for publication," and defendants' CDA immunity ceased at that point.

However, in Batzel, the court did not interpret "provided" as an ongoing process. The focus was on expectations regarding communications when they are made. The court was concerned that technology users would be discouraged from sending e-mails if website operators have no incentive to evaluate whether the content they receive is meant to be broadcast over the internet or kept private. Id. There are no similar concerns in this action; Sullivan obviously meant his messages to appear on the website. Whether website operators have a duty to withdraw content when an author later changes his mind is another question—one that is not addressed by Batzel.

1    The most analogous cases address whether CDA immunity continues to protect
2 a website operator who is on notice that a posting is potentially defamatory. It is well
3 established that it does. Universal Commc'n Sys., Inc. v. Lycos, 478 F.3d 413, 420 (1st Cir.
4 2007). In light of Congress' goals to encourage development of the internet and to prevent
5 the threat of liability from stifling free expression, CDA immunity has been interpreted very
6 broadly. Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1122–23 (9th Cir. 2003).
7 Website-operator liability based on notice has been rejected, because each "notification
8 would require a careful yet rapid investigation of the circumstances surrounding the posted
9 information, a legal judgment concerning the information's defamatory character, and an on-
10 the-spot editorial decision whether to risk liability by allowing continued publication."
11 Zeran v. America Online, Inc., 129 F.3d 327, 333 (4th Cir. 1997). The sheer number of
12 internet postings, perhaps combined with the anonymity of many contributors, makes this
13 unworkable for website operators, and the incentive would be simply to remove all
14 questionable content. See id.

15    Plaintiffs contend that the same difficulties are not presented when the author of the
16 defamatory content himself requests that it be taken down. The situation does present fewer
17 problems. However, as defendants point out, any time anyone *purporting* to be the author
18 of particular content requested retraction, website operators would still have an incentive to
19 simply remove the speech, rather than "conduct an investigation to determine (if possible)
20 whether or not the person making the request was the [actual] author and then make an
21 editorial decision on whether to continue publication." Defendants' Reply at 4.

22    We conclude that liability based on an author's notice, workable or not, is without
23 statutory support and is contrary to well-settled precedent that the CDA is a complete bar
24 to suit against a website operator for its "exercise of a publisher's traditional editorial
25 functions—such as deciding whether to publish, withdraw, postpone or alter content." Zeran,
26 129 F.3d at 330. The United States Court of Appeals for the Ninth Circuit has contrasted the
27 CDA with the Digital Millennium Copyright Act, which, "unlike the [CDA], provides
28

specific notice, take-down, and put-back procedures," and has suggested that it is up to Congress to provide similar procedures for the CDA. Batzel, 333 F.3d at 1031 n.19.

### IV

The CDA immunizes website operators from liability for content provided "by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Plaintiffs' next contend that defendants themselves constitute an "information content provider" with respect to the posted content. If that is so, the CDA does not protect them. Batzel, 333 F.3d at 1031.

An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of [the content]." 47 U.S.C. § 230(f)(3). Plaintiffs allege only the most minor participation by defendants in actually composing the allegedly defamatory postings: Defendants provided a list of categories from which Sullivan selected the title "Con Artists" for his post. As in our order dismissing the original complaint, we conclude that this participation is insufficient as a matter of law to make defendants information content providers with respect to the postings. See Batzel, 333 F.3d at 1035 ("[A] central purpose of the [CDA] was to protect from liability some service providers and users who take some affirmative steps to edit the material posted.").

However, plaintiffs have another theory. They allege that defendants use Ripoff Report messages as leverage to coerce targeted businesses to pay for defendants' Corporate Advocacy Program, which purports to help investigate and resolve posted consumer complaints. Essentially, plaintiffs allege that defendants encourage defamatory postings from others for their own financial gain and, therefore, are partly responsible for the "creation or development" of the messages.

It is obvious that a website entitled Ripoff Report encourages the publication of defamatory content.[1] However, there is no authority for the proposition that this makes the

---

[1] Here we use "defamatory" in the strict sense of tending to harm one's reputation regardless of truth or falsity. See Dan B. Dobbs, The Law of Torts §§ 401, 403 (2000).

- 5 -

1 website operator responsible, in whole or in part, for the "creation or development" of every
2 post on the site. Essentially, that is plaintiffs' position. After all, plaintiffs have not
3 alleged that defendants solicited Sullivan's postings in particular, or that they specifically
4 solicited any postings targeting Global. Nor have they alleged that defendants altered
5 Sullivan's comments, or had any more than the most passive involvement (providing a
6 list of possible titles) in composing them.

7 Unless Congress amends the statute, it is legally (although perhaps not ethically)
8 beside the point whether defendants refuse to remove the material, or how they might use it
9 to their advantage. Through the CDA, "Congress granted most Internet services immunity
10 from liability for publishing false or defamatory material so long as the information was
11 provided by another party." Carafano, 339 F.3d at 1122. Here, the material was
12 unequivocally provided by another party.

13 In their responsive memorandum, plaintiffs rely on Fair Housing Council of San
14 Fernando Valley v. Roommates.com, LLC, 489 F.3d 921 (9th Cir. 2007), reh'g granted, 506
15 F.3d 716 (9th Cir. 2007). As the case is scheduled for an en banc rehearing, that opinion
16 currently cannot be cited as precedent. Believing that Fair Housing is analogous to this
17 action, plaintiffs have filed a motion to stay until the Ninth Circuit issues its en banc opinion.
18 We reject that suggestion. There is no reason for this action to remain on our docket until
19 another court issues an opinion which may or may not be binding, or even persuasive, on
20 these issues. Plaintiffs may always appeal from this court's judgment.

**V**

For the foregoing reasons, **IT IS HEREBY ORDERED GRANTING** defendants' motion to dismiss the amended complaint (doc. 23) and **FURTHER ORDERED** denying plaintiffs' motion to stay (doc. 28). The clerk is instructed to enter final judgment for defendants.

DATED this 28th day of February, 2008.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge